# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

FILED
Mar 11  12 26 PM '04
U.S. DISTRICT COURT
NEW HAVEN, CONN.

Leroy J. Holdmeyer,

_____ Plaintiff,

v.

Ann M. Veneman Secretary,
_____ Defendant(s). Dept. of Agriculture

Case No. 3:04-CV-413(SRU)

(To be supplied by the Court)

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

1.  Plaintiff resides at the following location: 47 Deer Lane
    Ivoryton, CT 06442

2.  Defendant(s) reside(s) at the following location [Attach additional sheets if more
    space is required]: Department of Agriculture
    #1400 Independence Ave S. W.
    Washington, D.C. 20250

3.  This action is brought pursuant to [Check all spaces that apply to the type of
    claim(s) you wish to assert against the Defendant(s)]:

    ✓  Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et
       seq., for employment discrimination on the basis of race, color, religion, sex, or
       national origin.  Jurisdiction is specifically conferred on this Court by 42 U.S.C. §
       2000e-5(f).  Equitable and other relief is sought under 42 U.S.C. § 2000e-5(g)
       and the Civil Rights Act of 1991, 42 U.S.C. § 1981a.

    ___  Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. §§ 621,
       et seq., for employment discrimination based upon age.  Jurisdiction is alleged
       pursuant to 28 U.S.C. §§ 1331, 1337, and/or 1343.  Equitable and other relief is
       sought under 29 U.S.C. §§ 626(b) and (c) or   §§ 633a(b) and (c).

    My Date of Birth is: _____.

___   Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 701, <u>et seq.</u>, for employment discrimination on the basis of a disability against an employer which constitutes a program or activity receiving Federal financial assistance. Jurisdiction is asserted under 28 U.S.C. §§ 1331, 1337 and/or 1343. Equitable and other relief is sought under 29 U.S.C. § 794a.

___   Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12101, <u>et seq.</u>, for employment discrimination on the basis of a disability against a private employer. Jurisdiction is specifically conferred on this Court by 42 U.S.C.§ 2000e-5(f). <u>See</u> 42 U.S.C. § 12117(a). Equitable and other relief is sought pursuant to 42 U.S.C. § 2000e-5(g). <u>Id</u>.

4.   The acts complained of in this suit concern [Check all spaces that are applicable to your claim(s)]:

(A)   _____   Failure to hire me. I was refused a job on the following date(s): _____.

(B)   _____   Termination of my employment. I was terminated from my employment on the following date: _____.

(C)   ✓   Failure to promote me. I was refused a promotion on the following date(s): *10/22/99 Based on. Reprisal.*

(D)   _____   Other acts as specified below:

_____

_____

_____

_____

2

5.    The conduct of the Defendant(s) was discriminatory because it was based upon:

race [✓], color [✓], religion [  ], sex [✓], age [  ], national origin [✓] or disability [  ].

[Please check all applicable bases for your claim of discrimination and explain further,

if necessary]: _Reprisal EEO Complaint was Filed on 3/1/00._
_Initial EEO Complaint was Filed on 8/22/99_

6.    The facts surrounding my claim of employment discrimination are as follows

[Attach additional sheets, if necessary]:

_____

_____ SEE Attached Documents _____

_____

_____

_____

_____

7.    The approximate number of persons who are employed by the Defendant

employer I am suing is: _6000 - 7000. within FSB Agency._

8.    The alleged discrimination occurred on or about the following date(s) or time

period: _October , 1999 _____.

9.    I filed charges with the:

    ✓    Equal Employment Opportunity Commission

    ___    Connecticut Commission on Human Rights and Opportunities

3

10.    The Equal Employment Opportunity Commission issued a Notice of Right to Sue

letter **(copy attached)**, which I received on or about the following date:  _12/16/03_

**[NOTE:** If you filed charges with the EEOC or the CHRO, you **MUST** attach a copy of

the Notice of Right to Sue letter for this Court to consider your claim(s).  Failure to do

so may result in delaying consideration of your claim(s).]

11.    The EEOC or the CHRO determined that there was no probable cause to

believe that  discrimination occurred.  My reasons for questioning that

determination are as follows [Attach additional sheets, if necessary]: _I Received AJ's_

_(Kathleen M. Clarke) Decision on 2/27/02. I Based The Time Frame for_

_Rebutting The Summary Judgment Motion on The Date of Receiving The Motion._

_Not The Date of The Order. Deadline for Reply would Have Been 2/27/02._

_The Rebutting Documents were Over Night Mailed on 2/26/02._

12.    If relief is not granted, I will be irreparably denied rights secured under the law(s)

referred to in Item Number 3, above.

13.    WHEREFORE, Plaintiff(s) pray(s) that:

The Court grant such relief as may be deemed appropriate, including **[NOTE:** While all

of the forms of relief listed below may not be available in a particular action, you should

place a check next to each form of relief you seek.):

   ___    Injunctive orders (specify the type of injunctive relief sought): _____

                                                          _____;_

   ✓    Backpay;

   ___    Reinstatement to my former position;

   ✓    Monetary damages (specify the type(s) of monetary damages sought): ___

$ 300,000 00/100 For Physical + Emotional Injuries and Future exp.

__✓__ Other (specify the nature of any additional relief sought, not

otherwise provided for on this form): A Position within Commuting

Distance of Residence (Including Plum Island Positions) equal or

AND costs and attorneys' fees. Greater Than A GS-13 Grade.

## JURY DEMAND

I hereby DO __✓__ DO NOT _____ demand a trial by jury.

_Leroy J. Holdmeyer_
Original Signature of Plaintiff(s)

_LeRoy J. Holdmeyer_
Name (print or type)

_#47 Odor Lane_

_Ivoryton, CT 06442_
Address

_(860) 767-7110_
Telephone Number

Dated: _3/9/04_

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
Office of Federal Operations
P.O. Box 19848
Washington, D.C.  20036


Leroy J. Holdmeyer,
Complainant,

v.

Ann M. Veneman,
Secretary,
Department of Agriculture,
Agency.

Request No. 05A31021

Appeal No. 01A22894
Agency No. 000411
Hearing No. 160-A0-8549X

## DENIAL OF REQUEST FOR RECONSIDERATION

On June 6, 2003, Leroy J. Holdmeyer (complainant) timely initiated a request to the Equal Employment Opportunity Commission (the Commission or EEOC) to reconsider the decision in *Leroy J. Holdmeyer v. Department of Agriculture*, EEOC Appeal No. 01A22894 (May 8, 2003). EEOC regulations provide that the Commissioners may, in their discretion, reconsider any previous Commission decision. 29 C.F.R. § 1614.405(b). The party requesting reconsideration must submit written argument or evidence which tends to establish one or more of the following two criteria:  the appellate decision involved a clearly erroneous interpretation of material fact or law; or the decision will have a substantial impact on the policies, practices or operations of the agency. *Id.* For the reasons set forth herein, complainant's request is granted.

## BACKGROUND

In the previous decision, the Commission dismissed the appeal because we determined that the appeal raised the same claims as those alleged in a civil action complainant filed in a U.S. District Court.   On request for reconsideration, complainant claims that the civil action does not encompass the instant complaint; rather, the civil action only raises those issues contained in a *previously* filed complaint (Agency No. 990970).[1]   The agency did not file a response to complainant's request for reconsideration.

---

[1]Before filing in District Court, complainant appealed his first complaint to this office. *See Holdmeyer v. Dept. of Agriculture*, EEOC Appeal No. 01A05256 (August 6, 2002).

## ANALYSIS

EEOC Regulation 29 C.F.R. § 1614.409 provides that the filing of a civil action "shall terminate Commission processing of the appeal." Commission regulations mandate dismissal of the EEO complaint under these circumstances so as to prevent a complainant from simultaneously pursuing both administrative and judicial remedies on the same matters, wasting resources, and creating the potential for inconsistent or conflicting decisions, and in order to grant due deference to the authority of the federal district court. *See Stromgren v. Department of Veterans Affairs*, EEOC Request No. 05891079 (May 7, 1990); *Sandy v. Department of Justice*, EEOC Appeal No. 01893513 (October 19, 1989); *Kotwitz v. USPS*, EEOC Request No. 05880114 (October 25, 1988). The proper inquiry to determine whether the dismissal is warranted based on the filing of a civil action is "whether the issues in the EEO complaint and the civil action are the same, that is, whether the acts of alleged discrimination are identical." *Everett v. Dept. of Army*, EEOC Request No. 05930234 (August 5, 1993)(citing *Bellow v. United States Postal Service*, EEOC Request No. 05980913 (November 27, 1989).

After a careful review of the entire record, including an examination of the complaint filed in the civil action, we find the prior decision erroneously determined that the instant complaint alleged the same claims as those contained in the civil action. Rather, an examination of the record reveals that the civil action alleges discrimination when, among other things, complainant was not selected for a Providence Rhode Island, Circuit Supervisor vacancy in 1998. The instant complaint alleges complainant was retaliated against for filing the first EEO complaint when he was not selected for a Circuit Supervisor position in 1999. Accordingly, since we find that the appeal should not have been dismissed, we will now examine the merits of the complaint.

On March 1, 2000, complainant filed a complaint in which he alleged he was discriminated against on the basis of reprisal (prior EEO activity), when: (1) he was denied the opportunity to act in the Circuit Supervisor position in Middlebury, Connecticut; and (2) when, on October 22, 1999, he was not selected for the Circuit Supervisor position in Providence, Rhode Island. After an investigation, complainant requested a hearing before an EEOC Administrative Judge (AJ).

The AJ issued a decision without a hearing since she determined there were no material facts in dispute. Specifically, the AJ found that complainant failed to present any evidence that would raise a dispute as to the reasons for the nonselection. Indeed, complainant failed to dispute the selecting official's reasons for choosing the selectee, which were described in detail in an affidavit. Furthermore, the AJ found no one was selected to act in the Middlebury, Connecticut position. Therefore, the AJ found complainant failed to establish an inference of discrimination with respect to this issue.

The Commission's regulations allow an AJ to issue a decision without a hearing when he or she finds that there is no genuine issue of material fact. 29 C.F.R. § 1614.109(g). This regulation is patterned after the summary judgment procedure set forth in Rule 56 of the Federal Rules of

3

05A31021

Civil Procedure. The U.S. Supreme Court has held that summary judgment is appropriate where a court determines that, given the substantive legal and evidentiary standards that apply to the case, there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In ruling on a motion for summary judgment, a court's function is not to weigh the evidence but rather to determine whether there are genuine issues for trial. *Id.* at 249. The evidence of the non-moving party must be believed at the summary judgment stage and all justifiable inferences must be drawn in the non-moving party's favor. *Id.* at 255. An issue of fact is "genuine" if the evidence is such that a reasonable fact finder could find in favor of the non-moving party. *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986); *Oliver v. Digital Equip. Corp.*, 846 F.2D 103, 105 (1st Cir. 1988). A fact is "material" if it has the potential to affect the outcome of the case. If a case can only be resolved by weighing conflicting evidence, summary judgment is not appropriate. In the context of an administrative proceeding, an AJ may properly consider summary judgment only upon a determination that the record has been adequately developed for summary disposition.

After a careful review of the record, the Commission finds that grant of summary judgment was appropriate, as no genuine dispute of material fact exists. We find that the AJ's decision properly summarized the relevant facts and referenced the appropriate regulations, policies, and laws. Further, construing the evidence to be most favorable to complainant, we note that complainant failed to present evidence that any of the agency's actions were motivated by a retaliatory animus toward complainant.

## CONCLUSION

Accordingly, after a review of complainant's request for reconsideration, the previous decision, and the entire record, the Commission finds that complainant's request meets the criteria of 29 C.F.R. § 1614.405(b), and it is the decision of the Commission to grant the complainant's request. The decision of the Commission in Appeal No. 01A22894 is vacated, and the agency's final decision is affirmed. Complainant is provided with a right to request reconsideration again because we are examining the merits of his complaint for the first time.

## STATEMENT OF RIGHTS - ON APPEAL

## RECONSIDERATION (M0701)

The Commission may, in its discretion, reconsider the decision in this case if the complainant or the agency submits a written request containing arguments or evidence which tend to establish that:

1.    The appellate decision involved a clearly erroneous interpretation of material fact or law; or

4                                                      05A31021

2.     The appellate decision will have a substantial impact on the policies, practices, or
       operations of the agency.

Requests to reconsider, with supporting statement or brief, must be filed with the Office of Federal
Operations (OFO) **within thirty (30) calendar days** of receipt of this decision or **within twenty
(20) calendar days** of receipt of another party's timely request for reconsideration. *See* 29 C.F.R.
§ 1614.405; Equal Employment Opportunity Management Directive for 29 C.F.R. Part 1614
(EEO MD-110), 9-18 (November 9, 1999). All requests and arguments must be submitted to the
Director, Office of Federal Operations, Equal Employment Opportunity Commission, P.O. Box
19848, Washington, D.C. 20036. In the absence of a legible postmark, the request to reconsider
shall be deemed timely filed if it is received by mail within five days of the expiration of the
applicable filing period. *See* 29 C.F.R. § 1614.604. The request or opposition must also include
proof of service on the other party.

Failure to file within the time period will result in dismissal of your request for reconsideration
as untimely, unless extenuating circumstances prevented the timely filing of the request. Any
supporting documentation must be submitted with your request for reconsideration. The
Commission will consider requests for reconsideration filed after the deadline only in very limited
circumstances. *See* 29 C.F.R. § 1614.604(c).

### COMPLAINANT'S RIGHT TO FILE A CIVIL ACTION (P0900)

This decision of the Commission is final, and there is no further right of administrative appeal
from the Commission's decision. You have the right to file a civil action in an appropriate United
States District Court **within ninety (90) calendar days** from the date that you receive this
decision. If you file a civil action, you must name as the defendant in the complaint the person
who is the official agency head or department head, identifying that person by his or her full name
and official title. Failure to do so may result in the dismissal of your case in court. "Agency" or
"department" means the national organization, and not the local office, facility or department in
which you work.

### RIGHT TO REQUEST COUNSEL (Z1199)

If you decide to file a civil action, and if you do not have or cannot afford the services of an
attorney, you may request that the Court appoint an attorney to represent you and that the Court
permit you to file the action without payment of fees, costs, or other security. *See* Title VII of the
Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*; the Rehabilitation Act of 1973,

5

05A31021

as amended, 29 U.S.C. §§ 791, 794(c). **The grant or denial of the request is within the sole discretion of the Court.** Filing a request for an attorney does not extend your time in which to file a civil action. Both the request and the civil action must be filed within the time limits as stated in the paragraph above ("Right to File A Civil Action").

FOR THE COMMISSION:

*Carlton M. Hadden*

Carlton M. Hadden, Director
Office of Federal Operations

DEC 1 2 2003

Date

## CERTIFICATE OF MAILING

For timeliness purposes, the Commission will presume that this decision was received within five (5) calendar days after it was mailed. I certify that this decision was mailed to complainant, complainant's representative (if applicable), and the agency on:

DEC 1 2 2003

Date

Equal Opportunity Assistant

TO:        Director                                                 April 30, 2002
                Office of Federal Operations
                Equal Employment Opportunity Commission
                P.O. Box 19848, Washington, D.C. 20036

FROM:     Leroy J. Holdmeyer DVM
                47 Deer Lane
                Ivoryton, CT  06442

RE:          Notice Of Appeal (EEOC Hearing No.  160-AO-8549X)

Dear Sir,

This letter serves to document a Notice of Appeal regarding EEOC Hearing No. (160-AO-8549X).  There is sufficient evidence that the agency's asserted justification is false.  The enclosed supportive documents were presented to the Administrative Judge (Kathleen Mearn Clarke) on 2/26/02.  I received her decision on 2/27/02.  I based the timeframe of Rebutting the Summary Judgement motion on the date of receiving the notice not the date of the order. (deadline for reply would have been 2/27/02)  The witnesses identified in this case were never interviewed.  Furthermore, my name has been incorrectly spelled on several official documents including this appealed decision and written correspondence from the Administrative Judge.  Please review the entire submitted EEO file including the enclosed documents.  I reserve the right to add additional information pending the review of this case.

If you have any questions regarding this matter, please advise.

                                     Sincerely,

                                     Leroy J. Holdmeyer DVM

According to the U.S. Court of Appeals for the Eleventh Circuit, which includes Florida, to establish a case of retaliation, an employee must show that (1) s/he engaged in statutorily protected expression: (2) s/he suffered an adverse employment action: and (3) there is some causal relation between the two events. In order to prove the third element, an employee merely has to prove that the protected activity and the negative employment action are not completely unrelated. Thereafter, once the employee's case is established, the employer must proffer a legitimate, non-retaliatory reason for the adverse employment action.

1. August 22, 1999 a formal EEO complaint was filed. Complaint #990970 (see attached documents)
   *A person is protected against retaliation for opposing perceived discrimination if s/he had a reasonable and good faith belief that opposed practices were unlawful. Thus, it is well settled that a violation of the retaliation provision can be found whether or not the challenged practice ultimately is found to be unlawful.* (This standard has been adopted by every circuit that has considered the issue). *See, e.g., Little v. United Technologies, 103 F.3d 956, 960 (11th Cir. 1997), and Trent v. Valley Electric Association, Inc., 41 F.3d 524, 526 (9th Cir. 1994)*

2. October 22, 1999 I was denied a promotion. (Providence, RI Circuit Supervisory position)  An informal EEO retaliation complaint was initiated on November 6, 1999.

3. The protected activity (Complaint #990970) and the negative employment action (denied promotion) are related.

CIRCUMSTANTIAL EVIDENCE OF RETALIATION

An initial inference of retaliation arises where there is proof that the protected activity and the adverse action were related.
Read chronologically listed events 1—67  (especially # 27, 31, 32, 33, 35, 38, 39, 42, 43, 44, 45, 46, 47, 48, 49, 50)

The adverse action occurred shortly after the protected activity

| | |
|---|---|
| 3/22/99 | submitted application for Providence, RI position |
| 4/23/99 | initiated informal EEO complaint |
| 8/22/99 | filed formal EEO complaint citing unlawful employment discrimination practice involving the Providence, RI position |
| 10/22/99 | received notification of denied promotion |

The person who undertook the adverse action was aware of the protective activity before taking the action
| | |
|---|---|
| 9/27/99 | the entire EEO case file was made available to the selecting official (George Puchta) |

I think it is certainly worth knowing why Mr. Puchta has a different title now. (Special Assistant to the Deputy Administrator, Field Operations, FSIS) The record will show that FSIS Administrator, Tom Billy reassigned George Puchta (former Albany district Manager) during the week of 3/22/01 pending inquiries of management neglect. Federal and Congressional investigators were examining possible lapses and misconduct in the meat safety regulation in New York and New Jersey.

The Albany District Manager position was subsequently announced and selection made in the fall 2001.

The Agriculture Department's inspector general, Roger C. Viadero, had found, in a study (summer 2000), that some safety officers in Albany had filed reports indicating that they had made inspections at addresses where meat was not even sold: at one address, for example, there was a police station; at another a commercial laundry. Referring to grocery shops and wholesale meat outlets in New York at a Senate committee hearing, Mr. Viadero said, "Nobody's watching them."

Some companies went without normal refrigeration for five days. (July 6, 2000) After an anonymous tipster alerted some of Mr. Viadero's agents to a potential health hazard, they went out to check whether the meat inspection service had been on top of the situation. A meat inspector allegedly got drunk in the midst of a crisis caused by the partial shutdown of nine cooling units in the 14th Street Meatpacking District. "We arrived about 2:30 p.m. and found just one inspector and he was drunk," Roger Viadero said in testimony before the Senate's Agriculture Committee. Viadero said his confidence in the entire New York area safety inspection program was shaken. It's " a bit incredible to believe that management did not know about this... Nothing is more important than the integrity of our inspection system," added Viadero, who said problems in New York "just blows my mind."

Mr. Viadero also said Mr. Puchta's inspectors never informed him about the problems. Mr. Viadero said Mr. Puchta did not know what happened until July 12, when one of Mr. Viadero's aides passed on a tip from a whistle-blower.

Senator Richard G. Lugar, Republican of Indiana, the chairman of the Senate Agriculture Committee, said he was "deeply troubled by these reports from New York." He said Mr. Viadero and the committee were also looking into claims that inspectors in the New York region had been ignored, or even retaliated against, after reporting improprieties involving other inspectors.

An examination of government documents and interviews with current and former inspection officials suggest that Mr. Puchta, who has been in charge of inspections in the New York region for more than two decades, has long had a questionable record in cracking down on safety violations. Mr. Puchta joined the agency as an inspector in 1961 and became area supervisor in charge of plants in New York City and northern New Jersey in the mid-70's. In 1997, he was promoted to district manager for the Northeast region, which includes eight states.

Dr. Robert Bartlett, who was the director of the inspection service's program review office from 1979 to 1994, said Mr. Puchta, 68, had blocked several efforts during those years to force him to clamp down on unsavory plants.

"George Puchta thought that we were kind of tough on him," said Bartlett, a veterinarian. "What I tried to explain to him was we were actually trying to help him because his program wasn't working as well as it should have."

Dr. Barlett said Mr. Puchta had once suggested that given the difficulties of operating in such a congested setting, meat companies in New York City should not be held to the same sanitary standards as processors elsewhere. "I said, George, the standards are the same whether you are in Iowa or North Dakota of New York," Dr. Barlett said.

Velmer Chipps, who conducted several reviews of New York plants for Dr. Barlett's review program in the 1980's and 1990's, said that at times it appeared that plant owners had been tipped off that the reviewers were coming.

In 1995, Mr. Chipps said, he insisted on going into a plant in the Bronx that one of Mr. Puchta's inspectors had just shut down. Mr. Chipps said that he found a variety of contaminants inside the plant, and that Mr. Puchta "got mad" at him.

In a written response at that time, Mr. Puchta asserted that Mr. Chipps had focused on trivial problems and spent an inordinately long time conducting his inspections.

Roger Etzig, another former review official, said one review trip in the mid-1980's ended abruptly when Mr. Puchta told him that he had shut down a number of plants so that the reviewers could not go into them.

Rep. Nita Lowery (D-Westchester) called for an aggressive investigation into the meat inspectors' "egregious misconduct." "At a time when mad cow and foot-and-mouth disease are attacking our European neighbors, I am shocked and outraged to learn that some of New York's meat safety inspections have been delinquent in their duty to certify the safety of the region's food supply," Lowery wrote in a letter to Agriculture Secretary Ann Veneman.

The inspection service's methods have come under national debate over the last several years as the agency has sought to shift more responsibility for cleanliness to the plants themselves. The goal has been to eliminate harmful germs in a more comprehensive manner. But Mr. Viadero and other critics have said that many plants have been allowed to get by with inadequate safety plans. Mr. Viadero said the new system could work if inspectors provided close monitoring. "The only problem we have in New York is that people don't show up for work at all," he said. "Now what kind of inspection system is that?"

Mr. Tom Billy (FSIS Administrator), said he would "do whatever is necessary" to fix the problems in New York. Mr. Puchta was removed from his position as district manager.

The above information was derived from various newspaper articles including the New York Times.

Selecting Official Responsibilities. (FSIS Directive 4335.1  4/8/82)

1. Consider any candidate due special consideration or eligible for noncompetitive repromotion. Failure to select a candidate due any special consideration or repromotion because of demotion without personal cause must be justified in writing and based on the most compelling job-related reasons.
2. Make selection based on:
   a. Specific needs of the position to be filled.
   b. Extent to which each candidate would contribute to the total work of the unit of which the position is a part.
   c. Consideration of affirmative action goals and objectives.

The record will show that my entire EEO file was made available to Mr. Puchta prior to selection.

The record should be noted that the 1382 series was not paneled. The five candidates met the basic requirements (qualified candidates) for the GS-12/13 position.  I was informed that the 701 series was paneled (evaluated and rated best qualified) based on 10 + qualified candidates whom applied.  The panel selected nine" best qualified" candidates from the submitted applications.  I do not understand the wisdom behind identifying two different job titles for the same basic position.

The record should be noted that only part of my resume was identified in the investigative report and within Mr. Puchta's supplemental declaration. Chronologically listed work experience, education and training, and outside experience was submitted along with the awards, job elements and current performance appraisal.

Background comparative information:

| | Leroy Holdmeyer DVM | Tom Garvey |
|---|---|---|
| Semester hours of education | 276 | 30 + unknown |
| Degree | Yes | No |
| Processing trained | Yes | Yes |
| Processing experience | Yes | Yes |
| Slaughter trained | Yes | No |
| Slaughter experience | Yes | No |
| SSOP/HACCP trained | Yes | Yes |
| Number of supervised subordinates | 4+ (GS-9) | 1 (GS-4?) |
| GS-12 Superior performance level | 8 consecutive years | 0 |

Tom Garvey's performance appraisal attached to his application identifies his position as a GS-11 Food Technologist.

The reasons advanced by George Puchta is a pretext to hide the retaliatory motive.

**Element A:  Ability to manage a complex inspection program, involving many subordinates, including the review of program operations, identifying deficiencies, taking appropriate action, and evaluating overall program effectiveness.**
*Puchta's statement:  Dr. Holdmeyer gave little attention to overall FSIS program(s) analysis.  His response was much more concerned with communication, which would have been more appropriately addressed in element D.  Additionally, he described "evaluation" almost exclusively in terms of specific in-plant documents rather than the"...overall program effectiveness" specified in element A.  While it is entirely possible to get to the "big Picture" through a series or accumulation of "snapshots," Dr. Holdmeyer did not elaborate or show how he might do that and left questionable and highly unquantifiable how much help he would need in learning to distinguish the forest from the trees.*

Good communication skills are extremely important as a regulatory official. These skills are amplified when supervising subordinate personnel. The past eight years of maintaining a superior performance rating as a frontline supervisor clearly demonstrates my ability and commitment to carry out the agency's mission. The true evaluation of overall program effectiveness starts with in-plant documents, facility inspections, and communication with plant and inspection personnel. If a person relies solely on analysis of computerized data collected from in-plant field inspection personnel, the perceived overall program effectiveness can be entirely different than the actual performance of regulated activities. Look what happened in New York City (July 2000). Tom Garvey has no sustained supervisory experience in the field. The "subject matter expert on slaughter issues" statement describing his experience for this element is misleading and/or inaccurate. How can someone call themselves an expert with no slaughter field experience and no training in slaughter inspection operations? Did anyone notice the amount of spelling errors in Tom Garvey's application?

**Element B: Knowledge of and ability to interpret and apply laws, regulations, and procedures pertaining to the inspection of domestic and imported meat, poultry, and/or egg products.**

*Puchta's statement: Dr. Holdmeyer did not address the re-inspection of imported products or the inspection of egg products. He devoted a considerable discussion to an untypical and rather irrelevant determination he made related to a procedure, Progressive Enforcement Action (PEA), which was already obsolete at the time of this application.*

The re-inspection of imported products or the inspection of egg products are not relevant issues regarding the Providence, RI circuit position. There is no import and / or egg product assignment within this vacant circuit. Furthermore, I have provided supervisory coverage for these inspection activities but did not elaborate on this experience based on the fact that the announced position did not require this experience. I did identify export inspection responsibilities and experience. The vast majority of product that is exported from the United States requires a veterinarian's signature. This signature on official documents certifies that the product met all food safety and inspection requirements including specifications required by the importing country. I have certified numerous export documents throughout my career. Tom Garvey simply lacks the authority to sign export documents requiring a Doctor of Veterinary Medicine degree. The Providence, RI circuit frequently exports product that requires a veterinarian's signature. I would not characterize my decisions as a supervisory regulatory official as irrelevant in the eyes of plant management. Furthermore, all inspection personnel decisions are relevant to some degree. The thought process and the methodology of making a conclusive decision was emphasized with this PEA example.

**Element C:  Ability to supervise/integrate a geographically dispersed workforce which includes numerous employees engaged in a variety of domestic and imported meat, poultry, and egg products inspection program activities.**
*Puchta's Statement:  While the first two, and possibly third, paragraghs of Dr. Holdmeyer's application addressed the element requirements, the remainder of his discussion was about measuring work and the handling of performance and/or communication needs and goals.  Again, while it may be possible that these points could be made to relate to what the element requests, Dr. Holdmeyer did not provide that linkage.*
As I said previously, good communication skills are extremely important for a regulatory official.  Establishing and maintaining adequate work measurements is the responsibility of the circuit supervisor.  Supervisory personnel including managers should be held accountable for utilizing government resources in a cost efficient manner.  Establishing the standard of expected job performance of subordinates is also valid for this element.

**Element D:  Ability to communicate effectively with plant officials, inspection personnel, supervisors, various Agency officials, and the public in presenting information, leading meetings and discussions, and demonstrating support for new and changing Agency programs and initiatives.**
*Puchta's statement:  Dr. Holdmeyer, in his account of the inspection relationship with Middlebury Packing Co., was not careful to qualify that his involvement there had nothing to do with the subsequent convictions of the firm and its officers.  In fact, it is quite possible, on casual reading, to gain just the opposite impression.  Thus, that information is at best not accurate, and at worst not truthful.  In any case, it was irrelevant.  Dr. Holdmeyer also did not address how he has or would"...(demonstrate) support for new and changing agency programs and initiatives" as this element required.*
Mr. Puchta's allegations of being untruthful are quite disturbing.  It is quite obvious that Mr. Puchta did not do his homework.  The record will show that I was involved in a documented compliance case citing approx. 4000 lbs. of off-conditioned product from Est. 7838.  Mr. Al Lamson (Deputy District Manager of Enforcement) did show me the case file at the Boston district office.  It was my leadership in that plant at that time which enabled and supported a compliance case.  The inspector-in-charge was Chris Bailey.  I am sure that many other issues of misconduct were documented regarding this establishment.  I have provided relief supervisory coverage within this plant on many occasions.  I also provided the in-plant leadership during the last 11 months of slaughter operations.  During this time, the owners and operators of Middlebury Packing Co. were being prosecuted for criminal activity.  The in-plant inspection team held steadfast on all inspection challenges and manipulative behavior put forth by plant management.  This element documented the tense relationship between plant management and the in-plant inspection personnel that eventually developed in mutual respect.  This assignment was very difficult.  The in-plant inspection personnel such as John Roderick and Chris Bailey will substantiate my input and leadership on inspection activities within this establishment. The superior performance appraisal rating clearly documents a "true advocate of HACCP implementation and has continually offered assistance to plant management as well as in-plant personnel."

*In three of the five elements (A,B and C) Dr. Holdmeyer described in nearly identical terms how "I was instrumental in developing a custom exempt establishment information package. I was part of a team that analyzed the effectiveness of the custom exempt review process." However, other than to add, "... the package is currently in use in the Boston area," Dr. Holdmeyer did not further explain the benefits or the relevance of the "package" either to the Boston area (that office no longer exists) or to the elements in which this particular experience was referred. Similarly, Dr. Holdmeyer twice cited a decision made by him concerning a PEA plant (see element B above) that at best was only dimly related to what the elements requested.*

It is my understanding that each element is rated independently. Therefore, some examples will be cited more than once. The custom exempt package example is self-explanatory. The District Manager should be aware of the custom exempt establishment review process. There are several assigned custom exempt establishments throughout the Providence, RI circuit.

*By contrast, Mr. Garvey, in Element A, related with specificity how he applied his knowledge, skills and abilities to Hazard Analysis and Critical Control Point (HACCP) plans; the agency's Management Information System (MIS); the Performance Based Inspection System (PBIS); the Sanitation Standard Operating Procedures (SSOP); the Inspection System Guide (ISG) and many similar regulations, procedures and/or guidelines. He illustrated things he had done or performed related to these items. He discussed Egg Products Inspection and his role in advising importers of product and the Import System requirements. In short, by giving these detailed illustrations of his general and specific experiences, drawn directly from major inspection program areas, he fully responded to all the requirements of Element A.*

*In Element B, Mr. Garvey again, while more than adequately addressing the requirements of the element, additionally presented experience that demonstrate his appreciation of the need for a close working relationship with the agency's Compliance/Enforcement Staff, a current program top priority consideration. He recognized and gave clear examples of the importance of good and sound documentation whether applied to routine in-plant reports of other program evaluation.*

*In Element C, Mr. Garvey documented a wide range of duties and contacts, routine and special, which equated well to the requirements of this element. He described his limited but ongoing current and past supervisory responsibilities and the wider, more diversified groups he "served" in his various roles as Trainer, Facilitator, Acting Circuit Supervisor Coordinator and principal Labor Management Relations contact.*

*In Element D, Mr. Garvey expanded on many of the roles he identified in Element C, and described some of the actual activities and accomplishments in those roles. The duties and activities are related to communication with a generally and universally recognized need for improvement in this area. Mr. Garvey demonstrated success in achieving that. Especially impressive was his "Program Advocacy" during the implementation of HACCP. Mr. Garvey's record here documents an uncommon amount of responsibility given to, and carried out by, one at his grade level.*

If I didn't know Tom Garvey personally, I would get the impression that he was the District Manager by reading his application and Puchta's comments.  I am beginning to wonder what the Boston GS-15 District Manager and his GS-14  Deputy's

responsibilities included. Tom Garvey was a GS-11 Food Technologist. Researching data and organizing field training are all part of his expected job performance. Mr. Puchta over emphasized the basic requirements expected of not only Tom Garvey but each and every inspector in the field. Knowledge of HACCP, SSOP, PBIS, ISG and MIS and the ability to interpret these systems are common expectations of inspection personnel performance. What is this "Acting Circuit Supervisor Coordinator" role that Tom Garvey served in? There is no such position. How would someone interpret statements in Tom Garvey's application such as "I am responsible for evaluating and making final decisions on appeals of inspection decisions". The immediate supervisor of an appealed decision of inspection personnel is responsible and will respond verbally and in writing. Plant management has the right to appeal to the next level of supervision. Tom Garvey's position as a GS-11 Food Technologist would bear no responsibility in making the final decision. Where are all the awards for this perceived performance?

**Element E:  Ability to Communicate Technical Information in Writing**

Puchta's statement: ...was never more than a minor consideration for either applicant. Neither had significant examples of, or experience in, communicating technical information in writing, although Mr. Garvey did cite a kind of analysis that would be needed prior to attempting technical writing.

Mr. Puchta's statement is a vague, confusing explanation of element E that lacks substance. Minor consideration?  My position as a Supervisory Veterinary Medical Officer requires technical writing on a daily basis. I strive to adhere to three basic principles when writing technical information.

1.  Scientifically based
2.  Procedurally correct
3.  Legally defensible

I did cite an example of communicating technical information writing regarding a custom exempt establishment review of unsanitary conditions. The unsanitary conditions and the failure to correct these conditions were documented effectively which resulted in the removal of privileged exempted operations. As stated in the application, I have received **a time-off award for providing outstanding documentation,** which helped to further increase the effectiveness of the custom exempt establishment review process. My performance appraisal stated the following regarding technical writing. "He clearly communicates standards to subordinates both verbally and in writing; ... regarded as going above and beyond what is needed in providing detail documentation in regards to employee accomplishments." Tom Garvey states general experience related to mainly processing of previously identified inspection documents. Mr. Garvey's statement regarding "subject matter expert on slaughter issues" is not accurate. How can someone call themselves an expert with no slaughter field experience and no training in slaughter inspection activities?

Performance Appraisal Evaluation

| Criteria | Leroy Holdmeyer DVM | Tom Garvey |
|---|---|---|
| Title | Supervisory Veterinary Medical Officer | Food Technologist |
| Grade level | GS-12 | GS-11 |
| Job Element | Manages, Implements, and Correlates Program and organizational Culture Changes | Provide Technical Guidance on Processing Inspection |
| | Establishes and Maintains Inspection Standards and Monitors Activities | Establish/ Monitor Plant Inspection |
| | Manages and Evaluates Personnel | Reviews Monitoring Plans |
| | Representation and Working Relationships | Oversees PBIS Schedule |
| | Coordinates Veterinary Aspects of AM/ PM Inspection | Conducts Periodic Reviews |
| | Manages Administrative Activities | Performs Equal Opportunity and Affirmative Employment Responsibilities |
| | Performs Equal Opportunity and Affirmative Employment Responsibilities | |
| Performance Rating | Superior | Superior |

**The Performance elements and standards listed for a Supervisory Veterinary Medical Officer are identical to the Circuit Supervisor performance elements and standards..** Enclosed are copies of each performance element and the performance standard. Tom Garvey's performance elements and performance standards are vastly different from the Supervisory Veterinary Medical and Circuit Supervisor performance elements and standards. He was not held responsible for or rated on the same performance elements and standards required of Supervisory Veterinary Medical Officers and Circuit Supervisors. The past eight years (prior to application) of maintaining a superior performance rating as a frontline supervisor clearly demonstrates my ability and commitment to carry out the agency's mission.

The EEO Counselor's reported statement by George Puchta conflicts with my superior performance appraisal accomplishments.

Mr. Puchta's statement: "He said that he knows the Complainant and that he is a good Supervisory Veterinary Medical Officer (SVMO), but believes he has limited experience in Labor Management Relations and in dealing with employees and workforce problems. He said his application also did not provide enough evidence of experience in leadership and cultural change, e.g., HACCP and other things."

Performance Appraisal Accomplishments: Dr. Holdmeyer has become a true advocate of HACCP implementation and has continually offered assistance to plant management as well as in-plant personnel. Effectively uses all resources available to execute paradigm shift. He clearly communicates standards to subordinates both verbally and in writing. Assists IIC's with methods of communicating with plant managers during weekly meetings. Monitoring abilities are quite evident by reviewing his custom plant reviews. Continually provides both on and off target feedback to inspection personnel under his supervision. As SVMO, is regarded as going above and beyond what is needed in providing detail documentation in regards to employee accomplishments. Demonstrated to have full command when dealing with difficult management and situations. Anticipates and prepares for critical situations thus preventing disruption. Demonstrated high degree of expertise in AM/ PM inspection. Correlates disposition continually with IIC(s). Pathology specimens collaborate his findings.

I have exceeded the performance standard on the following elements:
1. **Manages, implements, correlates program and organization culture changes**
2. Establishes and maintains inspection standards and monitors activities
3. **Manages and evaluates personnel**
4. **Representation and working relationships**
5. Coordinates veterinary aspects of AM/ PM inspection

The performance elements and standards for a Supervisory Veterinary Medical Officer are identical to Circuit Supervisor's performance elements and standards. Tom Garvey was not responsible for or rated on these elements and standards. The Providence, RI Circuit Supervisor position requires the supervision of food inspectors and veterinarians performing slaughter, food processing and custom exempt establishment review activities. The past eight years (prior to application) of maintaining a superior performance rating as a frontline supervisor clearly demonstrates my ability and experience to carry out the agency's mission.

The lead EEO Counselor, Juanita A. Davalos reviewed each application. "Both applications were well written, with the Complainant's work experience heavy on the food safety aspects, e.g., slaughter, inspection, etc., while the Selectees experience seemed to be more in the area of information management systems with some general knowledge of food safety and contamination. The Complainant had a DVM degree, and the Selectee does not hold a college degree, they both had "Superior" performance ratings for the rating period prior to application for this position, and Complainant listed ten awards and the Selectee listed eight."